# Exhibit 36

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

| | |
|---|---|
| GRACE HALL, *et al.*<br>Individually and on<br>behalf of all others similarly situated,<br><br>              Plaintiff,<br><br>    v.<br><br>GANNETT CO. INC.,<br><br>              Defendant. | Case No. 3:19-cv-00296-JHM-RSE |

## DECLARATION OF MARY MADISON

I, Mary Madison, being of sound mind and over the age of 18, make the following declaration:

      1.      My name is Mary Madison and the facts contained in this declaration are within my personal knowledge and are true and correct.

      2.      I was employed by Gannett Co. Inc. ("Gannett"), from approximately July of 2013, until March of 2018, at a call center located in Louisville, Kentucky.

      3.      I worked with several hundreds of other Gannett hourly Call-Center Employees at the Louisville call center. Though there are several different divisions that Gannett employees work on, we all followed the same policies and procedures, as set by Gannett.

      4.      Initially, Gannett hired me as a Customer Care Agent I ("CCA"). As a CCA, it was my responsibility to receive inbound calls made by Gannett's clients. I would help customers set up services, upsell customers, alter their current service, cancel service, and answer general customer inquiries. In approximately 2014 I was promoted to a Customer Retention Specialist ("CRS"). As a CRS, it was my responsibility to receive inbound and outbound calls to customers who wanted to drop their services with Gannett or who had already dropped their services with Gannett. It was my job to convince these customers to not drop their service or to resume their services.

      5.      All of my jobs and my coworkers' jobs ("Call-Center Employees") were substantially similar, regardless of our specific job title, we all attended the same orientation together and we were all taught the same policies and procedures for logging into the computer, opening our programs, and clocking in for the day.

6. Gannett required me to arrive early every day. It was Gannett's policy that all Call-Center Employees arrive before their shift started so they would have enough time to get their computer systems up and running so they could be "call ready" at shift start. The trainers and managers at Gannett made sure that all Call-Center Employees knew they needed to arrive early, log into their computer, bring open their programs, check their emails, and only after all that had been done then clock in exactly at their shift start time.

7. Gannett strictly enforced its policy that Call-Center Employees cannot clock in until they are "call ready." Managers reminded us almost daily that we are not allowed to clock in until we are both "call ready" and it is our official shift start time.

8. Adherence is a key-performance-indicator used to evaluate Call-Center Employees. If your adherence is bad, you could receive write ups or even be terminated. If your adherence is good, you can be considered for promotions, pay increases, and bonuses. Adherence indicates a Call-Center Employees' timeliness. Clocking in before your shift start time, clocking in after your shift start time, or clocking in and not taking calls immediately can all decrease your adherence level. Because you needed to clock in and take calls exactly at shift start it was important to come in early enough to have time to get "call ready" and check your emails prior to shift start.

9. In order to be "call ready" I had to perform a series of functions on the computer that took a long time due to the computer running slowly and crashing often. First, I would have to turn on the computer, if I was working the morning shift. Then I would have to log in by entering in my username and password. After entering in my information, it would take anywhere from three (3) to six (6) minutes for the computer to open to desktop. After getting to the desktop, I then had to open and log into each of my programs. Opening and logging into each program took approximately six (6) to thirteen (13) minutes altogether. After opening my programs, I then needed to check and respond to emails. Because of our call volume there was rarely any time to check emails during the day, so our managers told us that we needed to review our emails before our shift start. Only after ensuring that each program was open and running, checking our emails, and waiting for our shift start time could a Call-Center Employee be considered "call ready" and allowed to clock in. However, this process could take longer due to system crashes as Gannett's computers were very unstable and the programs we used were also very unstable. I experienced system crashes during my log in procedures on average once a week. When the system crashes you have to reboot the computer and completely restart the log in process.

10. Though I arrived early every day to complete tasks necessary to the performance of my job as a Call-Center Employee I was not paid for this time. I was not allowed to clock-in until I had completed the computer boot up process, signed in, had all of my programs running, checked my emails, and waited for my official shift start time.

11. Gannett knew when I arrived at work every day because I was required to swipe my badge card to access my building, and to access the production floor where I worked. Gannett also knew when I began the process of preparing my computer because they tracked our key strokes to make sure that we remained on task during the work day. I also used a log-in ID and password to access my computer.

12. I was scheduled to and did work around forty hours each workweek. However, in addition to my scheduled work time, I often worked an additional one to three hours each week performing tasks benefitting Gannett that were a necessary and indispensable part of my job duties, logging into and starting up my computer, getting my programs up and running, and checking my emails. Gannett generally did not like for Call Center Employees to accrue unauthorized overtime. If an employee accrued unauthorized overtime, they could be disciplined. Overtime was only allowed when it was authorized such as when Gannett had mandatory overtime.

13. I was paid by the hour. My hourly rate was approximately $13.25 during the course of my employment. My shifts varied greatly during my employment with Gannett and I did not have one set schedule.

14. Though I regularly worked an additional one to three hours each week in addition to my scheduled hours, I was not paid for the additional time where I worked off-the-clock on behalf of Gannett.

15. Gannett's corporate policies and procedures applied to all Call-Center Employees at the Louisville call center and at the other Gannett call centers across the country. I know this because Gannett regularly made it clear that its policies, such as adherence, were made at the corporate level and that strict compliance with its policies was critical.

16. Based on my conversations with other Call-Center Employees and my personal observations, I know that other Call-Center Employees were required to work off the clock just as I did. They were subject to the same corporate policies as I was that required them to log in to their computers before their shifts had started.

17. Based on my conversations with other Call-Center Employees, I believe that they would be interested to learn that they may recover unpaid wages and overtime from Gannett and would want to join this lawsuit.

18. I had two (2) scheduled fifteen (15) minute breaks per day. Gannett's corporate policy was that any unscheduled breaks outside the two fifteen minute breaks were unpaid. I know this because if I needed to use the restroom at any time other than my scheduled break, I was told I must clock out, it was also listed in the company policies. Gannett did not pay me while I was on a short unscheduled break.

19. I declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: __Aug 8, 2019__

_Mary R Madison (Aug 8, 2019)_
MARY MADISON