# Exhibit 59

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| GRACE HALL, *et al.* Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GANNETT CO. INC.,<br><br>Defendant. | Case No. 3:19-cv-00296-JHM-RSE<br><br>JURY TRIAL DEMANDED<br><br>COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(B)<br><br>CLASS ACTION PURSUANT TO FED. R. CIV. P. 23 |

**DECLARATION OF VICTORIA LYONS**

I, Victoria Lyons, being of sound mind and over the age of 18, make the following declaration:

1. My name is Victoria Lyons and the facts contained in this declaration are within my personal knowledge and are true and correct.

2. I was employed by GCOE, LLC ("GCOE") and Gannett Co. Inc., ("Gannett") (collectively "Defendants") from approximately January of 2011, until January of 2016, at a call center located in Louisville, Kentucky.

3. I worked with several hundreds of other Defendants hourly Call-Center Employees at the Louisville call center. Though there are several different divisions that Defendants' employees work on, we all followed the same policies and procedures, as set by Defendants.

4. I was employed by Defendants as a Customer Care Agent I, then an E-mail Chat Representative, and finally as a Floor Lead. As a Customer Care Agent I, it was my responsibility to receive inbound calls made by Gannett's clients. I would help customers set up services for news delivery, upsell customers, alter their current service, cancel service, and answer general customer inquiries. As an e-mail chat representative, I did the same things as a Customer Care Agent I but over email or through an internet chat service instead of the phone. As a Floor Lead I would walk the floor of the call center and handle escalated calls and teach Customer Care Agents how to de-escalate calls.

5. My jobs and my coworkers' jobs ("Call-Center Employees") were substantially similar, regardless of our specific job title or whether we were directly employed by Gannett or GCOE, we all

attended the same orientation together and we were all taught the same policies and procedures for logging into the computer, opening our programs, and clocking in for the day.

6. Defendants required me to arrive early every day. It was Defendants' policy that all Call-Center Employees arrive before their shift started so they would have enough time to get their computer systems up and running so they could be "call ready" at shift start. The trainers and managers at Gannett made sure that all Call-Center Employees knew they needed to arrive early, log into their computer, bring open their programs, check their emails, and only after all that had been done then clock in exactly at their shift start time.

7. Defendants strictly enforced their policy that Call-Center Employees cannot clock in until they are "call ready." Managers reminded us almost daily that we are not allowed to clock in until we are both "call ready" and it is our official shift start time.

8. Adherence is a key-performance-indicator used to evaluate Call-Center Employees. If your adherence is bad, you could receive write ups or even be terminated. If your adherence is good, you can be considered for promotions, pay increases, and bonuses. Adherence indicates a Call-Center Employees' timeliness. Clocking in before your shift start time, clocking in after your shift start time, or clocking in and not taking calls immediately can all decrease your adherence level. Because you needed to clock in and take calls exactly at shift start it was important to come in early enough to have time to get "call ready" and check your emails prior to shift start.

9. In order to be "call ready" I had to perform a series of functions on the computer that took a long time due to the computer running slowly and crashing often. First, I would have to turn on the computer, if I was working the morning shift. Then I would have to log in by entering in my username and password. After entering in my information, it would take anywhere from three (3) to six (6) minutes for the computer to open to desktop. After getting to the desktop, I then had to open and log into each of my programs. Opening and logging into each program took approximately six (6) to thirteen (13) minutes altogether. After opening my programs, I then needed to check and respond to emails. Because of our call volume there was rarely any time to check emails during the day, so our managers told us that we needed to review our emails before our shift start. Only after ensuring that each program was open and running, checking our emails, and waiting for our shift start time could a Call-Center Employee be considered "call ready" and allowed to clock in. However, this process could take longer due to system crashes as Defendants' computers were very unstable and the programs we used were also very unstable. I experienced system crashes during my log in procedures on average once a week. When the system crashes you have to reboot the computer and completely restart the log in process.

10. Though I arrived early every day to complete tasks necessary to the performance of my job as a Call-Center Employee I was not paid for this time. I was not allowed to clock-in until I had completed the computer boot up process, signed in, had all of my programs running, checked my emails, and waited for my official shift start time.

11. Defendants knew when I arrived at work every day because I was required to swipe my badge card to access my building, and to access the production floor where I worked. Defendants also knew when I began the process of preparing my computer because they tracked our key strokes

to make sure that we remained on task during the work day. I also used a log-in ID and password to access my computer.

12. I was scheduled to and did work around forty hours each workweek. However, in addition to my scheduled work time, I often worked an additional one to three hours each week performing tasks benefitting Defendants that were a necessary and indispensable part of my job duties, logging into and starting up my computer, getting my programs up and running, and checking my emails. Defendants generally did not like for Call Center Employees to accrue unauthorized overtime. If an employee accrued unauthorized overtime, they could be disciplined. Overtime was only allowed when it was authorized such as when Defendants had mandatory overtime.

13. I was paid by the hour. My hourly rate ranged from approximately $12.00 to $15.00 during the course of my employment. My shifts varied greatly during my employment with Defendants and I did not have one set schedule.

14. Though I regularly worked an additional one to three hours each week in addition to my scheduled hours, I was not paid for the additional time where I worked off-the-clock on behalf of Defendants.

15. There is little to no distinction between working for Gannett and working for GCOE. To my knowledge I thought I had always worked for Gannett. I did not even know there was a company called GCOE.

16. While working for Defendants I sold and serviced customers who were subscribed to Gannett products. As far as I am aware GCOE does not sell anything and only services Gannett's customers.

17. While working for Defendants I worked in the Gannett building with other Gannett employees who are a part of this lawsuit. I had a Gannett ID card, was part of the Gannett healthcare plan, and my savings plan said it was the Gannett Co Inc. savings plan.

18. If an employee had any issues with other employees, their pay, or their hours we all reported to the same Gannett HR Department, regardless of what direct employer you have.

19. I do not know if GCOE has its own supervisors or if all of our supervisors are employed by Gannett. I believe all of my direct supervisors were employed by Gannett as they all had @ad.Gannett.com email addresses.

20. I do not remember how I applied for the job with Defendants.

21. Gannett's corporate policies and procedures applied to all Call-Center Employees at the Louisville call center, regardless of the direct employer, and at the other Gannett call centers across the country. I know this because Gannett regularly made it clear that its policies, such as adherence, were made at the corporate level and that strict compliance with its policies was critical.

22. Based on my conversations with other Call-Center Employees and my personal observations, I know that other Call-Center Employees were required to work off the clock just as I

did. They were subject to the same corporate policies as I was that required them to log in to their computers before their shifts had started.

23. Based on my conversations with other Call-Center Employees, I believe that they would be interested to learn that they may recover unpaid wages and overtime from Defendants and would want to join this lawsuit.

24. I declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on: Aug 9, 2019


VICTORIA LYONS